# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

BEVERLY B. MARTIN, as next friend of
KHALID MOUTON,

     Plaintiff,

     v.

AHMED HOLT, *et al.*,

     Defendants.

CIVIL ACTION NO.
5:23-cv-00004-MTT-CHW

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS

For two years while incarcerated in a Georgia prison, Khalid Mouton was held in solitary confinement in filthy and dangerous conditions. At the end of that two-year period, he had a stroke in his isolation cell. Despite observing Mr. Mouton in a state of medical distress, and hearing from other incarcerated men that Mr. Mouton was suddenly unresponsive, Defendant prison officials did nothing for two to three days. As a result of Defendants' inaction, Mr. Mouton is permanently brain damaged and physically disabled. But Defendants nevertheless argue that his case should be dismissed because—in their view—he has failed to state a claim for deliberate indifference to his serious medical needs, failed to state a claim for supervisory liability, and because one of his claims is barred by the statute of limitations and the doctrines of exhaustion and qualified immunity. Defendants' arguments all fail, and their motion to dismiss should be denied.

## INTRODUCTION

On January 4 or 5, 2021, Plaintiff Khalid Mouton, a man formerly in custody of the Georgia Department of Corrections ("GDC"), suffered a stroke in his solitary confinement cell at Georgia State Prison ("GSP").  (Doc. 67 ¶ 1.)  Upon suffering a stroke, he became suddenly, persistently, and uncharacteristically silent and unresponsive.  (*Id.* ¶ 102.)  Incarcerated men in surrounding cells repeatedly attempted to alert specific Defendants[1] to Mr. Mouton's unresponsiveness and asked those Defendants to check on him.  (*Id.* ¶ 2.)  But Defendants did not do so.  (*Id.*)  Instead, for a period of two to three days, Defendants did nothing, knowing that Mr. Mouton was experiencing a medical crisis.  (*Id.* ¶ 3.)

On January 7, 2021, Defendants took their first action in response to Mr. Mouton's stroke and transported him to the medical unit.  (*Id.* ¶ 5.)  By that time, however, it was too late.  (*Id.* ¶ 6.)  According to medical staff at the hospital to which he was taken, because Mr. Mouton's "symptoms had been ongoing for 48 hours" and because his "[l]ast known normal was 2 days ago," he was outside the window for a thrombectomy or thrombolytic therapy—the standard medical interventions for stroke patients that would have significantly ameliorated, if not completely reversed, the effects of the stroke.  (*Id.* ¶¶ 122, 124.)

As a result of Defendants' conscious indifference to his constitutional rights, Mr. Mouton is permanently brain damaged, partially paralyzed, blind in one eye, and unable

---

[1] These Defendants are enumerated in Plaintiff's amended complaint.  (Doc. 67 ¶¶ 100-03.)

to meaningfully communicate.  (*Id.* ¶ 8.)  This is his effort to obtain accountability and justice.

In his complaint, Plaintiff raises two claims.  First, he alleges that Defendants' failure to respond to his stroke violated his rights under the Eighth and Fourteenth Amendments, and that he suffered irreparable harm as a result of Defendants' deliberate indifference to his serious medical needs.  (*Id.* ¶¶ 187-200.)  Second, he alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments by placing and keeping him in prolonged solitary confinement in deplorable conditions, despite the known risks of housing him in this environment.  (*Id.* ¶¶ 201-09.)

## ARGUMENT

Defendants' respective motions to dismiss Plaintiff's complaint advance three arguments.  First, they argue that Plaintiff has failed to state a claim for deliberate indifference to his serious medical needs.  (Doc. 73-1 at 19-20; Doc. 74 at 5-8.)  Second, they argue that Plaintiff's conditions-of-confinement claim is barred by the Prison Litigation Reform Act's ("PLRA") exhaustion requirement, the statute of limitations, and qualified immunity.  (Doc. 73-1 at 8-17; Doc. 74 at 11-16.)  Third, they argue that Plaintiff has failed to state a claim for supervisory liability.  (Doc. 73-1 at 17-19.) Defendants' arguments are without merit, and their motions to dismiss should be denied.

**I.      Mr. Mouton's Complaint States a Claim for Deliberate Indifference to his Serious Medical Needs.**

First, Defendants argue that Mr. Mouton fails to state a claim for deliberate indifference to his serious medical needs because the complaint makes numerous

3

allegations against the Prison Administration and Individual Correctional Defendants but—in Defendants' view—does not sufficiently "detail[] what each individual Defendant actually did and knew." (Doc. 73-1 at 20; *see also* Doc. 74 at 6.) Defendants are mistaken.

To establish deliberate indifference to a serious medical need, Mr. Mouton must allege that Defendants (1) had a subjective knowledge of a risk of serious harm, and that they (2) disregarded that risk (3) by conduct that is more than negligent. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Plaintiff has plainly alleged all these facts in his complaint with respect to each Prison Administration and Individual Correctional Defendant.

As to Defendants' subjective knowledge of a risk of serious harm, Plaintiff alleges that each of the Prison Administration and Individual Correctional Defendants— Defendants Bobbitt, Wicker, M. Anderson, C. Anderson, Edwards, Sharpe, Johnson, Osborne, Glover, Howard, Harper, Florence, McLain, Hamilton, Hall, Putnam, Flowers, Howell, and Scott—"did, in fact, complete their required inspections and rounds" during the period when Mr. Mouton was unresponsive in his cell. (Doc. 67 ¶¶ 100-01.) During those inspections and rounds, each of these Defendants "did, in fact, observe and understand that Mr. Mouton was experiencing a medical emergency because he was passed out on the floor wearing urine-soaked clothing, he was not eating or drinking, he was not taking his prescribed medication, he was not able to communicate, and he was not able to respond to sensory stimuli." (*Id.* ¶ 101.) Each of these Defendants therefore

4

knew that Mr. Mouton was "suddenly, persistently, uncharacteristically, and totally silent and unresponsive." (*Id.* ¶ 102.) Moreover, other incarcerated men repeatedly alerted each Prison Administration and Individual Correctional Defendant to Plaintiff's condition, and then pleaded with those Defendants to check on him. (*Id.* ¶¶ 103-04.)

As to these Defendants' disregard of the risk of harm by more-than-negligent conduct, Plaintiff alleges that each Defendant refused to check on him or provide him with ameliorative medical treatment for two to three days. (*Id.* ¶¶ 104, 192, 196.) They "did not respond to the emergency by entering Mr. Mouton's cell" and they "actively ignored [other] men's pleas that they check on Mr. Mouton." (*Id.* ¶ 104.) At most, each Prison Administration and Individual Correctional Defendant "stopped at Mr. Mouton's door, asked if he wanted a shower, and when he did not respond, moved on to the next cell." (*Id.* ¶ 105.) When Mr. Mouton did not respond, "the Prison Administration and Individual Correctional Defendants each had direct confirmation that Mr. Mouton was experiencing a medical emergency, just as they had been told by other incarcerated men." (*Id.*) Yet these Defendants declined to take any reasonable corrective action; instead, they "did nothing."[2] (*Id.* ¶ 110.)

Despite these detailed allegations, Defendants complain that Plaintiff has not alleged his deliberate indifference claim with sufficient specificity because he refers to the Prison Administration and Individual Correctional Defendants "as a whole," which allegedly prevents each Defendant from being judged "separately and on the basis of

---

[2] At the end of his complaint, Mr. Mouton reiterates the key facts regarding these Defendants' subjective knowledge, deliberate disregard of the risk of harm, and reckless conduct. (*See* Doc. 67 ¶¶ 187-92.)

what that person kn[ew]." (Doc. 73-1 at 19-20 (citing *Estate of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 768 (11th Cir. 2016)).) But Defendants seem to misapprehend the thrust of Plaintiff's complaint, which is that *each* Prison Administration and Individual Correctional Defendant made their required inspections and rounds during the period when Plaintiff was unresponsive (Doc. 67 ¶ 101); *each* Defendant observed Plaintiff in a state of medical crisis (*id.*); *each* Defendant was alerted to Plaintiff's persistent unresponsiveness by other incarcerated men (*id.* ¶ 104); and *each* Defendant ignored the obvious signs that Plaintiff was in severe medical distress (*id.* ¶¶ 106-07).[3]

Moreover, the case Defendants cite for the proposition that each individual defendant "must be judged separately and on the basis of what that person knows" makes plain what that statement *actually means*: that "constructive knowledge of the risk is insufficient to establish deliberate indifference" and that "[t]he knowledge of one defendant may not be imputed to another."[4]   *Estate of Owens*, 660 F. App'x at 768. It does not mean that Plaintiff may not accuse multiple Defendants of the same misconduct, where each Defendant had subjective knowledge of the risk of harm to Plaintiff and each

---

[3] Because of these specific allegations about what each Defendant saw, heard, and knew, Defendant Johnson's assertion that the complaint is a "shotgun pleading" fails. (Doc. 74 at 9.) This is simply not the paradigmatic shotgun complaint where a defendant cannot draft a responsive pleading because they are not sure what they are accused of doing or not doing. *Cf. Regenicin, Inc. v. Lonza Walkersville, Inc*., 997 F. Supp. 2d 1304, 1314 (N.D. Ga. 2014) ("The defining characteristic of a shotgun complaint is that it fails 'to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading.'") (quoting *Beckwith v. Bellsouth Telecomms., Inc*., 146 F. App'x 368, 371 (11th Cir. 2005)). Here, Plaintiff was clear about what each Defendant did and failed to do.

[4] Mr. Mouton's complaint contains neither flaw. He does not impute one Defendant's knowledge to another or rely on any Defendant receiving constructive notice of the risk of harm.

Defendant evinced deliberate indifference to that risk.  *See Kyle v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) ("The fact that defendants are accused collectively does not render the complaint deficient" where "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.").

In short, Mr. Mouton has stated a clear-cut claim of medical deliberate indifference, and the claim should not be dismissed.[5]  *See McElligott*, 182 F.3d at 1255 ("We have repeatedly found that 'an official acts with deliberate indifference when he or she knows that a[] [person] is in serious need of medical care, but he fails or refuses to obtain medical treatment for [him].'") (quoting *Lancaster v. Monroe Cty., Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997)); *see also Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference").

## II.    Mr. Mouton's Conditions-of-Confinement Claim Should Not Be Dismissed.

Second, Defendants argue that Mr. Mouton's conditions-of-confinement claim should be dismissed for a host of reasons.  They argue that the claim is time-barred, unexhausted under the PRLA, and that qualified immunity otherwise bars the claim.

---

[5] In a brief, one-sentence argument, Defendants also allege that because Count I (the medical care claim) does not show an Eighth Amendment violation, qualified immunity bars the claim.  (Doc. 73-1 at 20; *see also* Doc. 74 at 15-16.)  However, because Mr. Mouton *has* stated a claim that Defendants were deliberately indifferent to his serious medical needs, qualified immunity is no bar.  *See Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity.").

(Doc. 73-1 at 7-17; Doc. 74 at 11-16.)  For the reasons set forth below, each argument is unavailing.

**A.      The GDC's grievance procedure was unavailable to Mr. Mouton.**

Under the PLRA, a person may file a prison-conditions lawsuit after "such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Failure to exhaust available remedies is an affirmative defense, not a pleading requirement.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Defendants thus "bear the burden of proving" that a plaintiff both had "available administrative remedies" and "failed to exhaust" those remedies.  *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008); *Presley v. Scott*, 679 F. App'x 910, 912 (11th Cir. 2017) ("It is the defendant's burden to prove a plaintiff has failed to exhaust his administrative remedies, *which requires evidence that the administrative remedies are availabl*e to the plaintiff." (emphasis added)).

Under § 1997e(a), an incarcerated person "need exhaust only 'available' administrative remedies."  *Ross v. Blake*, 578 U.S. 632, 638 (2016).  To show that a remedy is "available," Defendants must produce evidence of a procedure that offers the "possibility of some relief" by officials having "authority to act on the subject of the complaint."  *Booth v. Churner*, 532 U.S. 731, 736 n.4 (2001).  Put another way, availability requires that a process be "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).  An administrative process is unavailable when it operates as a "simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved [people]," or

8

when it is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 578

U.S. at 643.  Here, the GDC's grievance process was unavailable for both reasons.[6]

###### 1.      The GDC's grievance process operated as a simple dead end for Mr. Mouton's totality-of-conditions claim.

First, the GDC's grievance process was unavailable to Mr. Mouton because it

"operate[d] as a simple dead end." *Id.*  Plaintiff's claim, as articulated in the amended

complaint, is that "[t]he totality of the conditions [he] was subjected to while in solitary

confinement at GSP," as opposed to any single condition, "constituted cruel and unusual

punishment."  (Doc. 67 ¶ 201; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991)

("[C]onditions of confinement may establish an Eighth Amendment violation 'in

combination' when each would not do so alone" because the conditions "have a mutually

enforcing effect that produces the deprivation of a single, identifiable human need.").)

Prior to filing his complaint, Mr. Mouton attempted to grieve the totality of his conditions

in the Tier II Program and the mental health crisis unit, or ACU, but his grievances were

rejected on the same procedural ground: because they allegedly "[r]aise[d] more than one

(1) issue/incident," in violation of the GDC's grievance policy.  (Doc. 73-3 at 9.)

For example, Mr. Mouton filed a grievance about his conditions in the Tier II

Program bearing the following text:

---

[6] As explained in this brief, Defendants have failed to meet their burden of showing that Plaintiff had available administrative remedies, and their motions to dismiss should therefore be denied.  At a minimum, however, Plaintiff respectfully requests that the Court permit discovery and hold a hearing before resolving any factual disputes related to exhaustion.  *See, e.g., Perera v. Hagen*, No. 5:12-cv-00018, 2013 WL 3929132, at *3 (N.D. Fla. July 29, 2013) (granting a hearing on exhaustion at the motion-to-dismiss stage and noting that such hearings "appea[r] to be favored by the Eleventh Circuit").

DESCRIPTION OF INCIDENT: This is an emergency grievance about conditions in my cell.  I live on Tier II at Georgia State Prison in a cell that is dirty, rat-infested, and that smells terrible.  The toilet is often full of feces because officers control the flushing process from outside my cell.  This creates a disgusting smell that makes me feel sick.  My cell also has blood and feces on the floor of my cell and walls.  My toilet and sink leaks water, so there are puddles on the floor of my cell.  Although my cell is filthy, I have not been given supplies to clean it since January-May 16 2020 and a [sic] ongoing issue.  Since I have been on Tier II, I have only been given the opportunity to clean my cell with cleaning products 2 times.  I have asked officers many times to move me to a clean cell or to give me cleaning products to sanitize my cell, but they have not which is a [sic] ongoing issue.  This has been going on for a long time.

(Doc. 73-12 at 3.)  His grievance was rejected on the ground that it raised "more than one issue/incident," in violation of the GDC's grievance policy.  (*Id.* at 1.)

Mr. Mouton again complained about his conditions at GSP, this time in the ACU (dormitory D West II), in a similar grievance alleging the following:

DESCRIPTION OF INCIDENT: This is an emergency grievance.  I [have been held/am being held] in a cell in D West II, the mental health crisis unit, without a mattress, sheets, or blankets.  The only places to sleep in this cell are a metal bunk or the floor.  Sometimes, the floor is the best option because the metal bunk is covered in other peoples [sic] blood and feces.  All I can wear in the cell is a paper gown, which tears when I try to sit or sleep on it.  It is also hard to sleep because I see rats and roaches crawling around everywhere.  I cannot clean the cell because I have no cleaning supplies, and I cannot keep myself clean because I do not have a toothbrush, toothpaste, or soap.  I have complained about these conditions to officers, but they have not helped, D West II is supposed to be a place where I can go for mental healthcare, but I am afraid of going back there because of the terrible conditions I have experienced.

(Doc. 73-13 at 3.)  The warden again rejected this grievance for raising more than one issue.  (*Id.* at 1.)

A third grievance about Mr. Mouton's conditions in the ACU, where he described both the unsanitary conditions—"[d]ried [b]lood, [u]rine, [and] f[e]ces" in his cell,

10

"causing [r]ats, [r]oaches, [a]nts, and [f]lies to continu[o]usly raid the cell day and night"—and the effects of those conditions—"[m]y health . . . [is] in danger and [this] is a life threatening situation"—was similarly rejected for containing more than one issue. (Doc. 73-11 at 3, 6-7.)  Mr. Mouton appealed the rejection, alleging that his "complaint [wa]s about <u>one</u> issue concerning the ACU at GSP," but the GDC's Central Office declined to address the grievance, again citing the one-issue rule.  (*Id.* at 1-2 (emphasis in original).)

All three of Mr. Mouton's grievances concerned conditions with multiple contributing factors, making them analogous to his totality-of-conditions claim.  (*See* Doc. 67 ¶ 201.)  But he could not exhaust this claim because the GDC's grievance procedure did not allow him to.  In fact, the GDC interprets the one-issue policy in a manner that precludes exhaustion of *any* claim that is based on a sum of interrelated conditions.  Thus, the grievance policy operates as a "simple dead end" for the totality-of-conditions claim Mr. Mouton attempts to vindicate in this action.  *Ross*, 578 U.S. at 643.

Courts in this Circuit have not hesitated to find that the GDC's grievance process operates as a "simple dead end" when officials refuse to consider certain types of complaints.  For example, in *Martin v. Ward*, No. 1:18-cv-4617, Doc. 21 at *6-7 (N.D. Ga. Nov. 21, 2019), De'Kelvin Martin, a man on death row in Georgia, filed a grievance regarding the state's method of execution.  The prison rejected the grievance on the ground that it discussed "court decisions and sentences," which are "non-grievable issues" under the GDC's grievance policy.  *Id.* at *7-8.  When Mr. Martin subsequently

11

filed litigation to challenge the state's method of execution, the defendants argued that he had failed to exhaust his administrative remedies. *Id.* at *7. But the Court excused the failure, holding that the GDC's grievance procedure was unavailable to exhaust Mr. Martin's claim because the procedure treats method-of-execution complaints as non-grievable. *Id.* at *8-9. The Court credited Mr. Martin's allegation that "in every § 1983 action challenging Defendants' method of execution in this district, GDC officials have both denied the grievance and disclaimed any authority even to consider it," which the Court concluded rendered the procedure "the 'simple dead end' discussed in *Ross*." *Id.* at *8-9; *see also Nance v. Ward*, No. 1:20-cv-0107, 2020 WL 13614924, at *7-8 (N.D. Ga. March 13, 2020) (GDC's grievance procedure unavailable to exhaust method-of-execution claim because "officials routinely disclaim the authority to consider grievances that raise method-of-execution claims").

Mr. Mouton's case is similar to *Martin* and *Nance*. Like the plaintiffs in those cases—whose claims could not be exhausted under the GDC's grievance process because the GDC considered them non-grievable—Mr. Mouton's totality-of-conditions claim cannot be exhausted because the GDC rejects every grievance that raises more than one issue. Indeed, Defendants have not alleged that the GDC has *ever* provided relief to an incarcerated person who raised a totality-of-conditions claim or *ever* considered such a grievance without rejecting it under the one-issue rule.[7] Accordingly, Defendants have

---

[7] Plaintiff's counsel is not aware of any totality-of-conditions grievance being accepted by prison officials at GSP in at least the one-year period preceding Mr. Mouton's stroke, and they expect discovery to show as much.

not met their burden of showing that Mr. Mouton had an available administrative remedy to exhaust his totality-of-conditions claim.

> **2.     The GDC's grievance process was so opaque that it was incapable of use for Mr. Mouton's totality-of-conditions claim.**

Second, even if Mr. Mouton had attempted to separate his claim into distinct issues, there was no practicable way for him to comply with the one-issue rule because prison officials' interpretation of the word "issue" renders the grievance process "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 578 U.S. at 643. The GDC's grievance procedure states only that grievances raising "more than one (1) issue/incident" should be rejected.  (Doc. 73-3 at 9.)  But the policy does not specify what constitutes "one issue."

As is clear from the text of Mr. Mouton's complaints, he understood all his grievances to cover a single issue: first, the totality of his conditions in the Tier II Program, and second, the totality of his conditions in the ACU.  The plain language of the grievances confirms that understanding.  For instance, the first two lines of his grievance about conditions in the Tier II Program concisely state his complaint: "This is an emergency grievance about conditions in my cell.  I live on Tier II at Georgia State Prison . . ."  (Doc. 73-12 at 3.)  Similarly, his grievance appeal regarding the ACU makes plain that he understood that grievance to cover just "<u>one</u> issue concerning the ACU at GSP."  (Doc. 73-11 at 2 (emphasis in original).)  The remainder of each grievance simply provides more detail about the single issue it contains, consistent with the PLRA's requirement that a grievance "provid[e] sufficient detail to allow prison officials to

investigate." *Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 953 (11th Cir. 2016).

Mr. Mouton did not know how to grieve conditions in the Tier II Program or the ACU without raising more than one issue because the GDC's grievance policy provides no clarity on this point.  It does not explain what constitutes "one issue"; it provides no guidance about what an incarcerated person should do to grieve a problem that is not confined to a single "incident" (such as indefinite exposure to harmful physical conditions in a solitary confinement dormitory); and it does not explain what to do when a grievance that appears to contain only one issue is consistently rejected under the one-issue rule.  Such a procedure is unavailable because it is "so confusing" that an "ordinary prisoner" cannot "make sense of what it demands." *Ross*, 578 U.S. at 644; *see also Blevins v. FCI Hazelton Warden*, 819 F. App'x 853, 859 (11th Cir. 2020) ("[prison] rules [that] do not inform [people] about what to do if their appeal is repeatedly rejected for being illegible" may be "so opaque that [they] bec[o]me, practically speaking, incapable of use"); *Church v. Oklahoma Corr. Industries*, No. civ-10-1111, 2011 WL 4376222, at *7 (W.D. Okla. Aug. 15, 2011) (remedy unavailable where prison staff refused to accept a grievance without an incident date, when complaint "involve[d] an alleged wrong of a continuing nature and not a singular incident with an identifiable date").  In short, the one-issue rule rendered the grievance procedure unavailable for Mr. Mouton's totality-of-conditions claim.

### 3. Defendants' rebuttals fail.

Defendants' two arguments to the contrary are unpersuasive. First, they allege that "the Eleventh Circuit has already determined that the Grievance SOP's 'single issue' rules does not render the grievance process unavailable." (Doc. 73-1 at 12; *see also* Doc. 74 at 13.) In support of that assertion, they cite an unpublished Eleventh Circuit decision, *Pearson v. Taylor*, 665 F. App'x 858 (11th Cir. 2016), that they claim forecloses Plaintiff's argument about the one-issue rule. It does not.

In *Pearson*, the plaintiff complained that he could not exhaust his medical deliberate indifference claim because he already had two grievances pending, and GDC policy prevented him from either filing more than two grievances or raising the medical care issue on an existing grievance, because of the one-issue rule. *Id.* at 867. He alleged that this predicament left him without an available administrative remedy. *Id.* The court disagreed, reasoning that because "GD[C] policy allowed [the plaintiff] to withdraw a pending grievance and file a new one," he had an "available route" to exhaust his medical care claim. *Id.* at 868.

Not so for Mr. Mouton. Unlike the plaintiff in *Pearson*, Mr. Mouton had no route to exhaust his totality-of-conditions claim, because such claims simply cannot be exhausted under the GDC's one-issue rule. No matter how many times Mr. Mouton attempted to file a totality-of-conditions grievance, or substitute one such grievance for another, it would have been rejected—because the very essence of a totality-of-conditions complaint is that it involves multiple interdependent issues, which the GDC refuses to

consider under the one-issue policy.

Put another way, Mr. Mouton could not have exhausted his claim by filing one grievance about the rats in his cell, and another about the raw sewage in his cell, because he does not allege that any single condition, without more, violated his Eighth and Fourteenth Amendment rights.  Instead, he alleges that his solitary confinement in a host of deplorable conditions subjected him to cruel and unusual punishment.  *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 687 (1978) (finding that conditions in a prison's isolation units violated the Eighth Amendment when "taken as a whole").  But Defendants' application of the one-issue policy at GSP precluded Plaintiff from grieving the sum of his conditions.[8]

Second, Defendants contend that Plaintiff's argument regarding the one-issue rule is "irrelevant" because his three grievances about the Tier II Program and the ACU were "improper for reasons other than Plaintiff's failure to list one issue." (Doc. 73-1 at 13; *see also* Doc. 74 at 13.)  For instance, one of those grievances contained extra handwritten pages, and the other two were allegedly untimely.  (*Id.*)  But this argument misconstrues the law of unavailability.

The test for deciding whether a grievance procedure is available is not a subjective inquiry focused on the procedural problems with a particular plaintiff's grievance forms.

---

[8] To be clear, Plaintiff does not suggest that the one-issue policy is *per se* objectionable, or that all incarcerated people are relieved of the responsibility of grieving any complaint because of the one-issue rule.  To the contrary, Plaintiff concedes that many types of claims could be addressed through the grievance process without raising more than one issue.  However, the GDC's *application* of the one-issue rule prevented Plaintiff from successfully exhausting his totality-of-conditions claim.

Instead, the inquiry is "an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed [the process] available." *Turner*, 541 F.3d at 1085 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), overruled on other grounds by *Ross*, 578 U.S. at 635); *see also Martin*, No. 1:18-cv-04617, Doc. 21 at *8-9 (finding grievance procedure unavailable where multiple similarly situated people were unable to grieve a specific issue under the prison system's rules).  In this case, the answer is indisputably no—no ordinary incarcerated person would have been able to successfully raise a totality-of-conditions claim under the one-issue rule.  Indeed, Defendants have failed to produce a single example of a totality-of-conditions grievance filed by an incarcerated person at GSP that was not rejected for violating the one-issue rule.

In short, it simply does not matter what other problems Mr. Mouton's particular grievances contained, because any grievance he—or similarly situated people—attempted to file about the totality of their conditions at GSP would have been rejected under the one-issue policy.  Under the objective unavailability inquiry courts require, the grievance procedure was unavailable for Plaintiff to exhaust his totality-of-conditions claim.

### 4.   Other problems with GSP's grievance process confirm its unavailability.

Moreover, the general inability of people in GSP's segregation units to access or turn in grievance forms confirms that the one-issue rule left Plaintiff without an available administrative remedy.  As Plaintiff's counsel told the GDC in a letter dated May 21, 2020, addressed to Defendants Bobbitt, Toole, Holt, and Shepard, "[p]eople in the Tier II [P]rogram report chronic problems with the grievance process," including an inability to

"access grievance forms or receive timely responses from the prison, if they receive a response at all."  (Ex. A.)  Then, in a follow-up letter dated January 8, 2021, addressed to the GDC's general counsel, Plaintiff's counsel wrote that, since their original letter, "the grievance process at Georgia State Prison has become even more inaccessible" in that "[m]any men on the Tier II Program report a near-complete inability to access or turn in grievance forms within the timeframe required by Department policy," because prison counselors (who distribute and collect grievance forms) "are frequently absent from the dorm."  (Ex. B.)

Given these problems, there is no reason on this record to believe that Plaintiff would have been able to obtain more grievance forms to continue grieving his totality-of-conditions complaints, or that he would have been able to access counselors for guidance about how to successfully exhaust such complaints.  For this additional reason, the grievance procedure was unavailable to exhaust Plaintiff's claim.

In sum: Defendants bear the burden of proof on their exhaustion defense, which "requires evidence that the administrative remedies are available to the plaintiff." *Presley*, 679 F. App'x at 912.  Yet Defendants have produced no evidence to suggest that the GDC's grievance procedure was available to exhaust the type of claim at issue in this case.  As such, they have not met their burden of showing that Plaintiff had "available administrative remedies," and their motions to dismiss should be denied.  *Turner*, 541 F.3d at 1082.  At a minimum, the Court should allow written discovery to progress as ordered and hold a hearing to resolve any disputed factual issues related to exhaustion.

18

### B.    Mr. Mouton's totality-of-conditions claim is not time-barred.

Defendants argue that Count II of Mr. Mouton's complaint must be dismissed because the two-year statute of limitations expired before this suit was filed.  (Doc. 73-1 at 13.)  However, as an affirmative defense, "dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845-46 (11th Cir. 2004).  And as the Court noted in its May 2, 2023, text order, Defendants' argument ignores "the obvious—whether the statute of limitations was tolled and remains tolled because of the plaintiff's alleged incompetency."  (Doc. 77.)  Because Mr. Mouton's complaint (Doc. 67) and motion to appoint next friend (Doc. 2) amply show that Mr. Mouton has been mentally incapacitated since he suffered a stroke in early January 2021, the statute of limitations has been tolled, and the Court should reject Defendants' request to dismiss Claim II as time-barred.

The statute of limitations for a Section 1983 claim is determined by reference to state law, and federal courts look to the state's limitations period for personal injury torts. *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  Where applicable, federal courts also refer to and apply state tolling rules, *see id.* at 394, including Georgia's statutes that toll the statute of limitations for persons who are mentally incapacitated, *see Meyer v. Gwinnett Cty.*, 636 F. App'x 487, 489 (11th Cir. 2016) (citing O.C.G.A. §§ 9-3-90, 9-30-91).  The test for determining whether a plaintiff is entitled to tolling under O.C.G.A. §§ 9-3-90 and 9-30-91 is whether "the one claiming the disability has such unsoundness of mind . . .

19

as to incapacitate one from managing the ordinary business of life."  *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 698 (2012).

Defendants cannot show that Mr. Mouton's complaint fails to adequately allege mental incapacity to invoke Georgia's tolling provisions.  The complaint alleges that Mr. Mouton suffered a massive stroke in early January 2021 that rendered him unresponsive and unconscious for several days.  (Doc. 67 ¶¶ 1, 2, 5, 97-99, 114-18, 122, 124, 195.) Even though Mr. Mouton regained consciousness, the stroke "led to irreversible damage and persistent atrophy of [his] brain tissue" that has left him permanently and completely disabled.  (*Id.* at ¶¶ 125, 126.)  Specifically, because of the stroke, Mr. Mouton suffers from complete aphasia and significant memory loss, is unable to read, has a decreased ability to write, and is "completely dependent on others to manage his daily needs and protect himself from harm."  (*Id.* at ¶¶ 126, 9.)  Moreover, Mr. Mouton alleged that his mental disability "renders him legally incompetent" under Georgia law such that he had to file this suit through a next friend because he is "a person without capacity to bring or prosecute this action on his own."  (*Id.* at ¶¶ 13, 15.)[9]  Indeed, in granting his motion to appoint a next friend, the Court agreed it was "clear" that Mr. Mouton "is not able to pursue this case on his own" due to his stroke.  (Doc. 28 at 2.)

_____

[9] *See also* Doc. 2 at 5 (motion to appoint next friend explaining that Mr. Mouton is "incapable of managing his affairs as they pertain to this case"); Doc. 2-1 ¶ 14 (declaration of Dr. Joel B. Zivot stating that because of his stroke-induced disabilities, Mr. Mouton's ability to communicate, problem solve, and comprehend are impaired, and he "cannot manage his personal needs without assistance").

This is more than enough to invoke Georgia's tolling statute for mental incapacity. The Georgia Court of Appeals has held that allegations that a plaintiff was "totally physically and mentally incapacitated with the result that she was incompetent to manage her affairs" were sufficient to allege mental capacity and withstand defendant's motion to dismiss based on the statute of limitations.  *See Lowe v. Pue*, 150 Ga. App. 234, 237 (1979).  And the Eleventh Circuit has likewise held that allegations stating that the plaintiff was "physically and mentally incapacitated and was incompetent to manage his own affairs" were enough to invoke the tolling statutes and defeat a motion to dismiss. *Lawson v. Glover*, 957 F.2d 801, 805-06 (11th Cir. 1987); *see also Meyer*, 636 F. App'x at 489 (holding plaintiff's allegation that he "was of such unsound mind that he was unable to carry on his ordinary life affairs" was sufficient to invoke the tolling statute and withstand motion to dismiss).

With the benefit of Georgia's tolling statutes, Claim II of Mr. Mouton's complaint is not barred by the statute of limitations.  As Defendants correctly state, the limitations period for Mr. Mouton's claim is two years (Doc. 73-1 at 13), and under federal law, the statute of limitations does not begin to run "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights," *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987).  In a case such as this, where the plaintiff alleges a continuing violation of his federal constitutional rights, the statute of limitations does not begin to accrue until the violation ceases.  *See Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) (explaining continuous violation

doctrine); *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007) ("When the violation alleged involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases.").

Here, Mr. Mouton alleges that he was first assigned to the Tier II Program on or around November 1, 2018, where he stayed until he was moved to general population for a brief time in November or December 2020. (Doc. 67 ¶ 41 n. 4.) He returned to the Tier II Program on or around December 29, 2020, and left again when he was hospitalized on January 7, 2021. (*Id.*) Accordingly, the statute of limitations began to accrue at the earliest when he first left the Tier II Program in November or December 2020, but then stopped running when he suffered a stroke the first week of January 2021, and has remained tolled ever since. Because Defendants cannot show that it is "apparent from the face of the complaint" that Mr. Mouton's claim is time-barred, *LaGrasta*, 358 F.3d at 845, the Court should deny Defendants' motion to dismiss Count II on statute-of-limitations grounds.

**C.   Mr. Mouton's totality-of-conditions claim is not barred by the doctrine of qualified immunity.**

Defendants also argue that they are entitled to dismissal on qualified immunity grounds because, first, "the allegations in the amended complaint are insufficient to state a conditions-of-confinement claim based on Plaintiff's second period of confinement in the Tier II Program," and second, "the law was not 'clearly established' that Plaintiff's one week in Tier II violated the Eighth Amendment." (Doc. 73-1 at 15-16; *see also* Doc. 74 at 14-15.) Defendants' arguments are belied by Plaintiff's complaint and the doctrine

of qualified immunity.

###### 1.   Mr. Mouton has stated a constitutional violation.

First, Defendants argue that Mr. Mouton has not met his burden on the first qualified immunity prong—establishing a constitutional violation—because "he has failed to plausibly show that . . . [his week-long] period of confinement in the Tier II Program amounted to an Eighth Amendment violation."  (Doc. 73-1 at 14-15.) Defendants plainly misconstrue Plaintiff's claim.

Mr. Mouton's totality-of-conditions claim is not based on the one week he spent in the Tier II Program immediately preceding his stroke.  It is based on the *months and years* he spent in prolonged solitary confinement, in deplorable physical conditions, while his mental health deteriorated past the point of repair.  As Mr. Mouton alleged in his amended complaint:

He was held in the Tier II Program continuously from November 1, 2018, to January 7, 2021, with only a brief respite in the winter of 2020.  (Doc. 67 ¶ 41 n.4.)  For those two years, he was confined for 23 to 24 hours per day in cells that were filthy and vermin-infested.  (*Id.* ¶¶ 75, 78.)  He periodically cycled in and out of the prison's mental health crisis unit, the ACU, where he continued to be held in solitary confinement in cells that were smeared in bodily fluids and human waste.  (*Id.* ¶¶ 83-84.)  In those cells, he was deprived of mattresses, sheets, clothing, and hygiene items for prolonged periods of time.  (*Id.* ¶¶ 86-88.)  These conditions were ongoing and obvious; each Defendant was subjectively aware of them, and of the harm they caused, because the conditions in these

23

units "were so rigidly controlled at all management levels."[10]  (*Id.* ¶ 160.)

Based on these allegations, Mr. Mouton has more-than-plausibly stated an Eighth Amendment claim challenging his solitary confinement in harmful conditions during the two years—not the one week—he was housed in the Tier II Program.  *See, e.g.*, *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018) (allegations of "near-constant exposure to unhygienic conditions, for at least one year. . . in an isolation cell" stated an Eighth Amendment violation).[11]

## 2. It is clearly established that holding people in isolated confinement in conditions lacking basic sanitation violates the Eighth Amendment.

Next, Defendants argue that they are entitled to qualified immunity because "the law [is] not 'clearly established' that Plaintiff's one week in Tier II violated the Eighth Amendment."  (Doc. 73-1 at 16; *see also* Doc. 74 at 14-15.)  In their view, Mr. Mouton cannot overcome qualified immunity unless he identifies a case "from the Supreme Court, Eleventh Circuit, or Georgia Supreme Court holding that a week in solitary

---

[10] Defendant Johnson separately argues that Mr. Mouton did not adequately plead his conditions-of-confinement claim because he did not sufficiently allege "how or why Johnson is liable."  (Doc. 74 at 9.)  Defendant Johnson is incorrect.  The complaint clearly alleges that Defendant Johnson—one of the Prison Administration Defendants—"had final authority over Mr. Mouton's assignment to the Tier II Program and the authority to prescribe his conditions of confinement."  (Doc. 67 ¶ 202.)  He also had "direct control over the conditions of confinement in the Tier II Program . . . [and] the ACU.  (*Id.*)  And because of his "rounds at the prison," he was "on notice of Mr. Mouton's prolonged solitary confinement in filthy conditions . . ." (*Id.* at ¶ 206.)  He was thus subjectively aware of, and responsible for, Mr. Mouton's conditions and the harm they caused.

[11] To the extent Defendants' argument is premised on their assertion that Plaintiff is challenging his segregation and solitary confinement "in and of themselves," that argument also fails.  (Doc. 73-1 at 15.)  Plaintiff's complaint clearly states that he is challenging "[t]he totality of the conditions [he] was subjected to" in solitary confinement, including his "prolonged, isolated confinement," "prolonged exposure to unhygienic conditions," and "inadequate access to cleaning supplies and hygiene items."  (Doc. 67 ¶ 201.)

confinement constitutes cruel and unusual punishment." (Doc. 73-1 at 16.) Again, Defendants misread Plaintiff's complaint and misstate the law of qualified immunity.

As an initial matter, Defendants recite an obsolete test for qualified immunity. In *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), the Supreme Court considered and rejected the idea that a plaintiff must always identify a "materially similar" case in order to overcome a defendant's assertion of qualified immunity. In so doing, the Court explained that "[t]his rigid gloss on the qualified immunity standard" is "not consistent with [the Supreme Court's] cases." *Id.* Instead, the "salient question" in addressing qualified immunity is whether the defendant had "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.* at 741. Although this standard may be satisfied by showing a "materially similar" case, it can also be met by invoking a "broader, clearly established principle" that "should control the novel facts [of the] situation," or by showing that a defendant's conduct so obviously violated the constitution that "prior case law is unnecessary." *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014). "Exact factual identity with a previously decided case is not required." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

Under any of these formulations, Mr. Mouton prevails. Again, he does not allege that his one week in solitary confinement, standing alone, violates the Eighth Amendment. He alleges that his prolonged isolation in unhygienic conditions for two years constitutes cruel and unusual punishment. Defendants do not contest that proposition, nor could they, as there are indeed materially similar cases in the Eleventh

Circuit holding as much.  *See, e.g.*, *Chandler v. Baird*, 926 F.2d 1057, 1059, 1063-65 (11th Cir. 1991) (defendants not entitled to qualified immunity on claim that plaintiff's Eighth Amendment rights were violated when he was held in solitary confinement for multiple weeks, in a cold and filthy cell, without toilet paper or hygiene items).

At a minimum, *Chandler* and its progeny stand for the "broader, clearly established principle" that a person may not be housed in prolonged isolation, in profoundly unhygienic conditions, in a manner that causes severe discomfort.  Put another way, this is not an area of the law where preexisting cases have left a "hazy border" between lawful and unlawful conduct.  *Cf. Glasscox v. City of Argo*, 903 F.3d 1207, 1218 (11th Cir. 2018).  No reasonable prison official could have concluded that keeping Mr. Mouton in solitary confinement for two years, in a filthy, vermin-infested cell, cycling back and forth to a mental health crisis unit covered in feces, urine, and blood, was constitutionally permissible.  *See, e.g.*, *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (rejecting qualified immunity defense where incarcerated man was confined to "a pair of shockingly unsanitary cells" and "deplorably unsanitary conditions" for "an extended period of time").  Defendants are not entitled to qualified immunity.

## III.   Mr. Mouton's supervisory liability claim is adequately pleaded.

Finally, Defendants argue that Plaintiff has failed to state a claim for supervisory liability as to the Agency Defendants because Plaintiff has not shown a sufficient "causal connection" between the Agency Defendants' conduct and the constitutional violations at issue in this case.  (Doc. 73-1 at 18.)  Specifically, Defendants argue that Plaintiff has not

pointed to enough prior "specific instances" where the Agency Defendants were notified that prison staff at GSP regularly failed to respond to serious emergencies.  (*Id.* at 18-19.) Defendants' argument strains credulity and should be rejected.

Supervisory officials may be held liable in Section 1983 actions when "there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).  A causal connection may be established when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," or when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights."  *Id.*  These inquiries are similar in that the plaintiff must point to "multiple incidents" of past harm of which the supervisor was aware.  *Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022); *see also Danley*, 540 F.3d at 1315.

Mr. Mouton has credibly alleged a supervisory liability claim under this standard. Specifically, he alleged that the Agency Defendants—Holt, Toole, Shepard, Sauls, and Lewis—had "direct knowledge" of unconstitutional conditions and of numerous instances of serious harm in GSP's Tier II Program dorms from "several sources."  (Doc. 67 ¶ 128.)  These sources included but were not limited to the following: (1) periodic inspections of the Tier II Program dorms; (2) staffing reports reflecting GSP's understaffing crisis; (3) internal and external audits of GSP's segregation units; (4) incident reports documenting every medical emergency and death that occurred in those

units; and (5) a letter from undersigned counsel.  (*Id.* ¶¶ 129-34.)

That letter, dated May 21, 2020, addressed to Defendants Bobbitt, Toole, Holt, and Shepard, described "a litany of unconstitutional conditions in GSP's Tier II Program units," including persistent understaffing.  (*Id.* ¶ 135.)  The letter stated that it was common for men in the Tier II Program to experience "violence and medical emergencies when no officers [were] present to respond," and described two suspected homicides, one large fire, and three serious medical emergencies that had recently occurred in the Tier II Program housing units, to which officers responded belatedly or not at all.  (*Id.* ¶ 136.) The letter then noted that GSP's poor staffing practices had to led to an increase in suicides at the prison—five in the preceding year, and 14 between 2014 and 2018—and it implored the Agency Defendants to "ensure that officers are able to monitor people on Tier II and in other housing units with sufficient frequency to prevent gratuitous . . . death."  (*Id.* ¶¶ 140.)  But the Agency Defendants declined to take corrective action "and thereby acquiesced to the[se] unreasonably dangerous conditions."  (*Id.* ¶ 142.)

These allegations are more than sufficient to state a claim for supervisory liability. In fact, they are similar to cases where courts have found supervisors liable for the acts or omissions of their subordinates.  For example, in *Danley*, 540 F.3d at 1315, a pretrial detainee stated a claim for supervisory liability against the jail administrator and the sheriff when he alleged that those supervisors "had knowledge" of prior excessive force incidents "through 'force reports and similar documents, [detainee] complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation."

And in *Ingram*, 30 F.4th at 1255-56, a plaintiff stated a claim for supervisory liability against the sheriff when he pointed to "five other incidents," in addition to the excessive force incident involving the plaintiff, that the sheriff failed to appropriately investigate. *Cf. Keith v. DeKalb Cty.*, 749 F.3d 1034, 1051 (11th Cir. 2014) (declining to find supervisory liability where plaintiff pointed to only one prior "isolated" incident); *Cottone v. Jenne*, 326 F.3d 1352, 1361 (11th Cir. 2003) (no supervisory liability where plaintiff did not allege "any specific facts" showing that supervisors had knowledge of officers' failure to monitor people during "even one prior incident").

Like the plaintiff in *Ingram*, Mr. Mouton has pointed to multiple prior incidents at GSP—more than 20 unnatural deaths, one large fire, and three serious medical crises—of which the Agency Defendants were aware. (Doc. 67 ¶¶ 136-39.) And like the plaintiff in *Danley*, Mr. Mouton has alleged that the Agency Defendants' knowledge of these incidents came from numerous credible sources, including staffing reports, audits, incident reports, and attorney complaints. (*Id.* ¶¶ 128-34.) Indeed, Plaintiff's case is a far cry from cases like *Keith* and *Cottone*, where the plaintiffs failed to point to even a single prior incident or deprivation. Accordingly, Mr. Mouton has sufficiently alleged a claim for supervisory liability against the Agency Defendants.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motions to dismiss Plaintiff's complaint.

Respectfully submitted,

/s/Alison Ganem
Alison Ganem (Ga. Bar No. 284894)
Vanessa Carroll (Ga. Bar No. 993425)
Atteeyah Hollie (Ga. Bar No. 411415)
SOUTHERN CENTER
FOR HUMAN RIGHTS
60 Walton Street, NW
Atlanta, Georgia 30303
(404) 688-1202
(404) 688-9440 (fax)
aganem@schr.org
vcarroll@schr.org
ahollie@schr.org

/s/ Zack Greenamyre
Zack Greenamyre (Ga. Bar No. 293002)
Samantha J. Funt (Ga. Bar No. 943783)
MITCHELL, GREENAMYRE, FUNT
& SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305
404-812-4747
404-812-4740 (fax)
zack@mitchellshapiro.com
sam@mitchellshapiro.com

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing using the CM/ECF system, which will send notification of filing to all counsel of record.

<u>/s/Alison Ganem</u>

May 18, 2023