**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

|  |  |  |
|---|---|---|
| **BEVERLY B. MARTIN, as next friend of KHALID MOUTON,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **CIVIL ACTION NO. 5:23-cv-4 (MTT)** |
| **AHMED HOLT, et al.,** | ) ) | |
| **Defendants.** | ) ) ) | |

<u>**ORDER**</u>

Khalid Mouton, by and through his next friend, Beverly Martin[1], sued defendants Ahmed Holt, Robert Toole, Stan Shepard, Jack Sauls, Sharon Lewis, Trevonza Bobbitt, Michael Anderson, Josh Wicker, Deidra Edwards, Juanita Sharpe, Chad Putnam, Joseph Hall, Teyundra Hamilton, Shayla McClain, Barnard Florence, Cierra Harper, Jessica Howard, Carl Anderson, Marjorie Glover, Cory Osborne, Heather Flowers, Angela Howell, Kenneth Scott, and Javaka Johnson in their individual capacities for alleged violations of his Eighth Amendment rights while housed at Georgia State Prison ("GSP"), which the Georgia Department of Corrections ("GDC") has since closed.  Doc. 67.  All the defendants moved to dismiss Mouton's first amended complaint.  Docs. 73; 74.  For the following reasons, those motions (Docs. 73; 74) are **DENIED**.

---

[1] After filing his original complaint, the Court granted Mouton's motion to appoint Beverly Martin as his next friend based on his alleged mental and physical incapacitation.  Docs. 2; 28.

# I. BACKGROUND

At all relevant times, Mouton was housed as a state prisoner at GSP and the defendants were GDC employees, some of whom worked at GSP.[2]  Doc. 67 ¶¶ 17-41. Mouton breaks the defendants into three groups: (1) the Agency defendants, (2) the Prison Administration defendants, and (3) the Individual Correctional defendants.  *Id*. ¶¶ 17-40.  Each defendant is listed below, along with the position they held at all times relevant to Mouton's complaint.

The Agency defendants are Holt, GDC Assistant Commissioner of the Facilities Division; Toole, GDC Director of Field Operations; Shepard, GDC Southeast Regional Director; Sauls, GDC Assistant Commissioner of the Health Services Division; and Lewis, GDC Statewide Medical Director.  *Id*. ¶¶ 17-21.

The Prison Administration defendants are Bobbit, the GSP Warden; M. Anderson, a GSP Deputy Warden of Security; Wicker, a GSP Deputy Warden of Security; Edwards, the GSP Deputy Warden of Care and Treatment; Sharpe, a GSP Tier II Program Unit Manager; and Johnson, a GSP Tier II Program Unit Manager.  *Id*. ¶¶ 22-27

The Individual Correctional defendants are Glover, a GSP Captain; Osborne, a GSP Captain; C. Anderson, a GSP Lieutenant; Howard, a GSP Lieutenant; McLain, a GSP Sergeant; Florence, a GSP Sergeant; Harper, a GSP Sergeant; Putnam, a GSP Correctional Officer ("CO"); Hall, a GSP CO; Hamilton, a GSP CO; Flowers, a GSP CO; Howell, a GSP CO; and Scott, a GSP CO.  *Id*. ¶¶ 28-40.

---

[2] Mouton was released from prison on January 26, 2023.  GDC, *Find an Offender*, https://services.gdc.ga.gov/GDC/OffenderQuery/jsp/OffQryForm.jsp?Institution= (search, "Mouton, Khalid").

**A. GSP's Tier II Program**

From November 1, 2018 until January 7, 2021, Mouton was housed in GSP's Tier II Program.  Doc. 67 ¶ 41, at 19 n.4.  "In the winter of 2020, [Mouton] was briefly moved to a general population dormitory."  *Id*. at 19 n.4.  From the face of his complaint, it is unclear exactly when he was moved, why he was moved, and for how long he was moved into general population.  GSP's Tier II Program "is a 270-day 'incentive program' used to encourage 'appropriate adjustments' so that people 'may be returned to a general population housing assignment.'"  *Id*. ¶ 42.  However, according to Mouton, the program did not operate this way "in practice."  *Id*.  Rather, "people in the Tier II Program, including Mr. Mouton, were assigned to in-cell lockdown for 23 to 24 hours per day, often indefinitely for months or years."  *Id*.  Their "out-of-cell recreation" time was limited—prisoners would typically go "weeks or months" without any recreation, even though "prison policy required that men in the Tier II Program be allowed at least five hours of out-of-cell recreation every week."  *Id*. ¶ 47.  And the "out-of-cell" time they did receive was outdoor placement in a steel cage.  *Id*.  The program also restricted access to property, visitation, phone calls, religious services, and the prison's programs.  *Id*. ¶¶ 46, 48.

Prisoners assigned to GSP's Tier II Program were either housed in G building or K building.  *Id*. ¶ 43.  In these buildings, the prisoners lived in eight-by-ten-foot cells, each with an eight-inch-wide window "covered in plexiglass and a layer of perforated metal" and a solid metal door that had a meal tray box and a flap door for handcuff placement.  *Id*. ¶¶ 44-45.  The flush buttons for the toilets in the cells were outside the cells, which meant prison staff had to flush the toilets.  *Id*. ¶ 49, 60.  Often the prison

staff was not present to flush them, resulting in "a foul smell of human waste." *Id*. ¶ 60. And in some cells, the plumbing was broken—"toilet water and waste leaked onto the floor and mold grew on the walls." *Id*. ¶ 61. "Despite the foul conditions, men confined to the Tier II Program housing units had almost no access to cleaning products to sanitize their cells." *Id*. ¶ 62. Rats, mice, and cockroaches also infested the Tier II cells. *Id*. ¶ 59. Their showers were no better. *Id*. ¶ 63. Showers were "covered in mildew, mold, fruit flies, and dead roaches," "smattered with urine and feces," "strewn with leftover food," and/or "left uncleaned for weeks." *Id*. And, when they could shower—an irregular occurrence—correctional officers often left them in the showers "for hours at a time" with running water. *Id*. ¶¶ 64-65.

### 1. Mouton's Tier II Experience

While in Tier II, Mouton was restricted to an eight-by-ten-foot cell "for 23 to 24 hours per day." *Id*. ¶ 75. He describes his cell as "filthy"—rats and other vermin infested his cell and prison staff would, at times, fail to flush his toilet, resulting in a "stench" from urine and feces. *Id*. ¶¶ 78, 80. Mouton had difficulty cleaning his cell, and "[f]or at least one two-month period … he was not given any cleaning supplies to sanitize his cell." *Id*. ¶ 79. During one winter month, prison staff, who were in control of opening and closing Mouton's window, "refused to close his window, so the temperature in his cell was freezing cold." *Id*. ¶ 81. To raise the temperature and "keep himself warm," "Mouton covered the window with plastic wrap from prison-issued sandwiches." *Id*.

He "rarely" received out-of-cell time—he typically "went weeks at a time without being offered the opportunity for either indoor or outdoor recreation" and "[o]n at least

one occasion, he went two to three months with no recreation at all." *Id*. ¶¶ 76-77. Officers would sometimes allow him to shower. *Id*. ¶ 77. However, the officers "left him in a small, cramped shower stall for hours, with the hot water running, and he vomited from excessive heat exposure." *Id*.

Mouton alleges that the culmination of these circumstances in solitary confinement led him to a mental health "crisis point." *Id*. ¶ 82. "He experienced auditory and visual hallucinations, paranoia, difficulty sleeping, and panic attacks. He cut his wrists and, on several occasions, was sent to the [Acute Care Unit ("ACU")], where he continued to be housed in solitary confinement in deplorable conditions." *Id*. ¶ 83.

## B. The ACU

Even though it was the prison's "mental health crisis unit," the ACU also operated as "a solitary confinement dormitory." *Id*. at 19 n.4. This unit consisted of thirteen single-person cells and one shower. *Id*. ¶ 70. Prisoners housed in the ACU were prohibited from wearing clothes. *Id*. ¶ 73. They either wore a thin medical gown or a suicide prevention smock. *Id*. The cells had "ankle-height, steel bunks" that "were covered in crusted feces and the blood of previous inhabitants." *Id*. ¶ 71. These bunks did not have a mattress, sheets, or blankets. *Id*. ¶ 70. Like the Tier II cells, the walls and toilets "were smeared in bodily fluids and human waste," and no cleaning supplies were provided. *Id*. ¶¶ 71-72. Prisoners housed in the ACU also "were denied basic hygiene products, like toothpaste and soap." *Id*. ¶ 72.

*1. Mouton's ACU Experience*

Mouton cycled in and out of the ACU.  *Id*. ¶ 88.  Each time he was there, he experienced every condition outlined above: (1) his cell "was smeared with the feces, urine, and blood of previous occupants," (2) his "property was confiscated," (3) "he was clothed in only a thin paper gown" that "often ripped, so he remained naked in his cell," (4) he "had no mattress, sheets, or blankets" and thus "slept on a steel bunk or on the floor" that "[h]e covered .. in sandwich wrappers so that he would not have to sleep on the filthy concrete," and (5) he was not provided soap, toothbrush, toothpaste, or an adequate amount of toilet paper, causing him "to use his own thin paper gown to wipe himself."  *Id*. ¶¶ 84-87.

## C. Mouton's Stroke

On January 4 or 5, 2021, while in Tier II, Mouton had a stroke in his cell.  *Id*. ¶¶ 97, 117.  As a result, Mouton "went silent."  *Id*. ¶ 97.  Another prisoner in his dormitory who typically communicated with Mouton noticed that he had stopped responding.  *Id*. ¶¶ 96-98.  Consequently, prisoners in the dormitory told the Prison Administration and Individual Correctional defendants "that Mr. Mouton was experiencing a medical emergency" and asked them to check on him.  *Id*. ¶¶ 103-04.  Instead, "the Prison Administration Defendants and the Individual Correctional Defendants told other men in the dormitory that Mr. Mouton was 'fine.'"  *Id*. ¶ 106.  Moreover, each Prison Administration and Individual Correctional defendant "saw trays of food and water go untouched for days," ignored Mouton's unresponsiveness to shower requests, and either ignored Mouton's failure to take his medications or failed to administer his medications.  *Id*. ¶¶ 105, 109, 111, at 34 n.6.

The Prison Administration and Individual Correctional defendants did not respond until the morning of January 7, 2021, when a correctional officer—"at the persistent urging of another man in the dormitory"—found Mouton "unconscious on the floor" in "urine-soaked clothing." *Id*. ¶¶ 101, 114-115.  "His left eye was fixed and nonreactive and his right arm and hand had no strength." *Id*. ¶ 115 (cleaned up).  He was then transported to GSP's medical unit at 8:55 a.m. *Id*. ¶ 116.  At 9:20 a.m., Mouton "was airlifted to Memorial Health University Medical Center in Savannah." *Id*.  Mouton arrived at the hospital around an hour later. *Id*. ¶ 117.

Upon arrival at Memorial Health, medical personnel took two CT scans of Mouton's brain. *Id*.  The CT scans confirmed Mouton had a stroke that was "caused by a disruption of blood flow to the left side of his brain." *Id*. ¶ 118.  "Individuals who experience this type of stroke, and who are brought to the hospital in a timely way, are prime candidates for a thrombectomy or thrombolytic therapy." *Id*. ¶ 119. "[T]hrombectomies are widely known to be the standard treatment for stroke patients because they completely alter the course of recovery"—resulting in either "full" or "meaningful" recovery. *Id*. ¶ 120.  However, to experience this type of recovery from a thrombectomy after a stroke, the stroke victim must receive it "within either a 6-to-16 or 6-to-24 hour window after their 'last known normal.'" *Id*.  Thus, Memorial Health doctors ultimately "concluded that Mr. Mouton was no longer a candidate for a thrombectomy or thrombolytic therapy" because, as the hospital records note, his "last known normal" was two to three days before. *Id*. ¶¶ 122, 124, at 40 n.7.  Indeed, his neurologist wrote: "After reviewing the patient's case and discussions with interventional radiology we

have decided to forego any acute treatment as the patient is outside the therapeutic window for thrombectomy with his last known normal being 2 days ago."  *Id*. ¶ 124.

Mouton's stroke caused "irreversible damage" to his brain.  *Id*. ¶ 125.  He now suffers from the following permanent impairments:

a. Inability to walk, requiring around-the-clock wheelchair use;
b. Right-sided paralysis;
c. Right-sided neglect, i.e., loss of control over, and lack of awareness of, his formerly dominant right hand, arm, and leg;
d. Complete aphasia, i.e., an inability to produce clear speech;
e. Memory loss;
f. Near-complete blindness in his left eye;
g. Inability to read, and decreased ability to write;
h. Increased risk of accidents, injuries, and health decline; and
i. Reduced lifespan.

*Id*. ¶ 126.  Mouton never filed a prison grievance regarding his stroke "because he was subjectively and objectively unable to access or use the grievance process, even at the simplest of steps."  *Id*. ¶ 16.

## D. GSP's Problems

Mouton alleges GSP had numerous problems between 2018 and 2021, many of which stemmed from staffing issues.  For instance, "GSP was chronically understaffed and had one of the highest officer vacancy rates among Georgia prisons, at around 60 percent."  *Id*. ¶ 51.  As a result, correctional officers failed to check on prisoners housed in Tier II "at least once every 15 or 30 minutes," as required by prison policy.  *Id*. ¶¶ 50, 52.  Instead of going "cell-to-cell to speak with" prisoners, as prison policy required, correctional officers "walk[ed] by people's cells without speaking to them, without asking if they were okay, and without otherwise slowing down to observe them or ensure they were responsive."  *Id*. ¶ 52, at 21 n.5.

Between 2014 and 2018, fourteen prisoners at GSP committed suicide.  *Id*. ¶ 139.  Between April 2020 and April 2021, five prisoners housed in GSP's Tier II Unit committed suicide or died by homicide, and two others "died under circumstances that the prison classified as 'undetermined.'"  *Id*. ¶ 53.  In April 2020, a prisoner in GSP's Tier II Unit "became feverish and began coughing up blood."  *Id*. ¶ 55.  Mouton alleges that "[o]ther men in the unit shouted for officer assistance, but none arrived for nearly three hours."  *Id*.  And another prisoner in GSP's Tier II Unit "was left in his cell for nearly 24 hours after falling and injuring himself.  Unable to stand, the man soiled himself and was eventually found on the ground crying, lying in a pool of water from his leaking sink."  *Id*. ¶ 56.  In 2020, two prisoners "were left seizing in their cells."  *Id*. ¶ 137.  One prisoner was left for two hours and the other was refused access to the medical unit.  *Id*.  Finally, there was a large fire that correctional officers failed to timely control.  *Id*. ¶ 136.  According to Mouton, "[i]n many instances, no officers were present or reachable during these emergencies."  *Id*. ¶ 57.

Mouton further alleges that the Agency defendants received notice that GSP was unsafe.  First, he alleges that staffing reports, audits, and other warnings informed them that the Prison Administration and Individual Correctional defendants were not regularly checking on prisoners housed in Tier II, "such that eight or more hours could go by without a staff person checking on" these prisoners.  *Id*. ¶ 131.  Specifically, in 2018, an internal audit "noted multiple 'areas of concern' in the prison's provision of mental health care to people … in solitary confinement."  *Id*. ¶ 171.  Another internal audit in 2018 provided that "'[e]valuation for services in Isolation/Segregation is important because of the impact (emotional and cognitive) of lockdown' and that '[t]he Mental Health

Department at Georgia State Prison should need no reminder of such impacts and the possibilities of completed suicides within lockdown as a consequence of emotional and cognitive decompensation.'" *Id*. ¶ 172.

A 2019 internal audit also "provided additional, urgent warnings.  [It] noted that counselors in the Tier Program regularly 'copied and pasted' notes about mental status check-ups and that security officers failed to conduct 30-minute rounds in administrative segregation dorms."  *Id*. ¶ 174.  In April 2019, a psychiatrist reported to the GDC that mental health programming in Tier II "is not adequate."  *Id*. ¶ 169.  And in November 2019, an internal audit of GSP revealed "that people held in solitary confinement '[were] not being offered recreation in accordance to [sic] GDC policy and procedure guidelines.'"  *Id*. ¶ 170.  "[O]ther audits noted that corrective action plans had been submitted to the Office of Health Services, of which Defendants Sauls and Lewis are both members."  *Id*. ¶ 176.  Each of the above audits "were specifically directed to" the Agency defendants and Prison Administration defendant Bobbitt.  *Id*. ¶ 176.  Mouton alleges that "[t]he conditions described in the 2018 and 2019 audits were unchanged from the conditions in January 2021."  *Id*. ¶ 177.

Second, Mouton alleges the Agency defendants were also aware that the Prison Administration and Individual Correctional defendants were failing to respond "to medical and safety emergencies" as evidenced by "the alarming number of medical emergencies, suicides, homicides, and other preventable deaths in the GSP Tier II Program units between April 2020 and April 2021" about which the Agency defendants received incident reports.  *Id*. ¶¶ 132-33.

Finally, Mouton alleges the Agency defendants were on notice of the conditions in Tier II based on letters sent by his counsel.  *Id*. ¶¶ 134-35; Doc. 82-1.  A May 21, 2020 letter to defendants Bobbit, Toole, Holt, and Shepard contained detailed information about the conditions in Tier II and the ACU, issues resulting from understaffing, and a lack of medical care.  Doc. 82-1.  For example, the letter referenced the various previously mentioned emergencies and how the chronic understaffing played a role in those emergencies.  Doc. 67 ¶¶ 136-40.  It also included information on the "problematic conditions" in Tier II and ACU cells—rats, "filthy showers," human waste, etc.—and "specifically referenced … Mouton's experiences." *Id*. ¶ 179.  Mouton's counsel, in the letter, asked Bobbit, Toole, Holt, and Shepard "to remedy the problems."  *Id*. ¶¶ 140, 179.  GDC's counsel responded "with a two-sentence email stating that she would 'work with Warden Bobbitt to research the allegations and remediate any problems that we find.'"  *Id*. ¶ 180.

A September 18, 2020 letter from Mouton's counsel to defendant Bobbitt noted "the increase in suicides and the persistence of unconstitutional conditions."  *Id*. ¶ 182. And an October 28, 2020 letter "alerted Defendant Bobbitt to a man in his custody who had been repeatedly tortured by other incarcerated people and requested that Defendant Bobbitt take certain measures to protect him."  *Id*. ¶ 183.  In response, the GDC stated "that the Department would 'not discuss' the housing assignments of the people identified in Plaintiff's counsel's letter" and "referred Plaintiff's counsel to the Department's website … to 'view the facility to which each is assigned.'"  *Id*. ¶ 184.

The GDC closed GSP in early 2022.  *Id*. ¶ 185.

**E. Procedural History**

Mouton filed this action on January 4, 2023.  Doc. 1.  After the defendants moved to dismiss Mouton's original complaint, he filed an amended complaint alleging an Eighth Amendment deliberate indifference to medical needs claim and an Eighth Amendment conditions of confinement claim based on his solitary confinement against each of the defendants.  Docs. 54; 58; 67 ¶¶ 187-209.  On April 27, 2023, the defendants moved to dismiss Mouton's amended complaint.[3]  Docs. 73; 74.  On June 9, 2023, the Court ordered the parties to submit supplemental briefs addressing the "more than gross negligence" standard announced in the Eleventh Circuit decision, *Wade v. McDade*.  67 F.4th 1363 (11th Cir. 2023); Docs. 85; 89; 90.

## II. STANDARD

The Federal Rules of Civil Procedure require that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Rule12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* "Factual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

---

[3] Defendant Johnson is represented by separate counsel and has filed his own motion to dismiss.  Doc. 74.  His arguments are substantively the same, with some exceptions, as the other defendants' arguments.  *Compare* Doc. 73-1 *with* Doc. 74.  Therefore, the Court refers to the defendants, including Johnson, collectively.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002). The complaint must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts. *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018).

### III. DISCUSSION

The Prison Administration and Individual Correctional defendants (the "GSP defendants") argue Mouton has failed to state a deliberate indifference to medical needs claim and a conditions of confinement claim under the Eighth Amendment, and that even if he has, they are entitled to qualified immunity. Docs. 73-1 at 14-17, 19-20; 74 at 4-11, 14-16. They further argue that what they call Mouton's first conditions of confinement claim is barred by the Prison Litigation Reform Act ("PLRA") because he failed to exhaust his administrative remedies.[4] Docs. 73-1 at 8-13; 74 at 11-13. Finally, the Agency defendants argue Mouton's supervisory liability claims fail as a matter of law. Doc. 73-1 at 17-19. For the following reasons, the Court disagrees.

---

[4] Johnson also argues that Mouton's complaint is a "shotgun pleading." Docs. 74 at 9-11; 87 at 6-8. Although Mouton does allege the same claims against multiple defendants, he does not fail to specify which defendant is responsible for which act, as explained more fully below.

**A. The GSP Defendants' Alleged Deliberate Indifference to Mouton's Serious Medical Needs**

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[5] *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic … the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority."  *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).  "'Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply.'"  *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).  Here, Mouton has not, and could not, argue that the defendants were acting outside the scope of their discretionary authority.  Thus, the defendants are entitled to raise the shield of qualified immunity.

To overcome a qualified immunity defense, Mouton must allege that (1) the facts, viewed in his favor, establish a constitutional violation as to each defendant; and (2) the unconstitutionality of the defendants' conduct was clearly established at the time of the

---

[5] "At the motion to dismiss stage in the litigation, 'the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined.'"  *Keating v. City of Mia.*, 598 F.3d 753, 760 (11th Cir. 2010) (quoting *GJR Invs., Inc. v. Cnty. Of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998)).  "[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded."  *Iqbal*, 556 U.S. at 673.

alleged violation.[6]  *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Because Mouton has successfully alleged an Eighth Amendment violation and that the GSP defendants' conduct violated clearly established law, the GSP defendants are not entitled to qualified immunity.

*1. Constitutional Violation*

"The Eighth Amendment's prohibition against 'cruel and unusual punishments' protects a prisoner from 'deliberate indifference to serious medical needs.'"  *Kuhne v. Fla. Dep't of Corrs.*, 745 F.3d 1091, 1094 (11th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To state an Eighth Amendment deliberate indifference to serious medical needs claim, Mouton must sufficiently allege objective and subjective components.  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  For the objective component, Mouton must allege that he had "an objectively serious medical need" that, "if left unattended, poses a substantial risk of serious harm."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (cleaned up).  For the subjective component, Mouton must allege that each defendant "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than *gross* negligence."  *Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis in original).  Finally, Mouton

---

[6] A right becomes "clearly established" in three ways.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  First, Mouton can show that a materially similar case has already been decided, consisting of binding precedent by the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court.  *Id*.  Second, Mouton can show that a broader clearly established principle should control the novel facts of the particular case—that is, the unconstitutionality of the instant conduct must be apparent by looking to the guiding principles of the previous case, irrespective of the underlying factual situation.  *Id*.  Third, Mouton can show that the conduct is so egregiously unconstitutional that prior case law is unnecessary.  *Id*.

must allege that his injury was caused by the GSP defendants' wrongful conduct. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  The GSP defendants do not move to dismiss based on the objective or causation components.  Rather, they argue that Mouton has failed to allege the subjective component.  Docs. 73-1 at 19-20; 74 at 6-8.

Subjective knowledge requires that a defendant "was 'both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also have drawn the inference.'"  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008) (alterations omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A defendant cannot be held liable for a constitutional violation for failing "to alleviate a significant risk that he should have perceived but did not."  *Id.* at 1331 (quoting *Farmer*, 511 U.S. at 837).

The GSP defendants argue Mouton's complaint fails to allege an Eighth Amendment deliberate indifference to medical needs claim because it "fails to set forth specific allegations about each individual Defendant that details what each individual Defendant actually did and knew."  Docs. 73-1 at 19-20; 74 at 6-7.  The Court disagrees.  Although Mouton's allegations address collectively the Prison Administration and Individual Correctional defendants, he alleges within those categories that *each* defendant knew Mouton was experiencing a medical emergency, that *each* refused to check on him and ignored his unresponsiveness, and that when *each* failed to act, he or she did so with more than gross negligence.  Docs. 67 ¶¶ 100-113, 189-192; 89 at 5-14; *see Kyle v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) ("The fact that defendants are

accused collectively does not render the complaint deficient.").  For example, Mouton

states the following allegations against *each* defendant:

- "Each of these individuals (the Prison Administration and Individual Correctional Defendants) did, in fact, complete their required inspections and rounds on January 4, 5, 6, and 7, 2021, and did, in fact, observe and understand that Mr. Mouton was experiencing a medical emergency because he was passed out on the floor wearing urine-soaked clothing, he was not eating or drinking, he was not taking his prescribed medication, he was not able to communicate, and he was not able to respond to sensory stimuli ... The Prison Administration and Individual Correctional Defendants saw trays of food and water go untouched for days, so they knew that Mr. Mouton was not eating or drinking due to his unresponsive and debilitating condition."  Doc. 67 at 34 n.6, ¶ 101.

- "Each of the Prison Administration and Individual Correctional Defendants knew that Mr. Mouton was suddenly, persistently, uncharacteristically, and totally silent and unresponsive."  *Id*. ¶ 102.

- "Each of the Prison Administration and Individual Correctional Defendants did, in fact, hear other incarcerated men in the unit tell them that Mr. Mouton was experiencing a medical emergency because he was suddenly, persistently, uncharacteristically, and totally silent and unresponsive."  *Id*. ¶ 103.

- "[E]ach of the Prison Administration and Individual Correctional Defendants stopped at Mr. Mouton's door, asked if he wanted to shower, and when he did not respond, moved on to the next cell.  When Mr. Mouton did not respond, the Prison Administration and Individual Correctional Defendants each had direct confirmation that Mr. Mouton was experiencing a medical emergency, just as they had been told by other incarcerated men."  *Id*. ¶ 105.

- "[E]ach of the Prison Administration and Individual Correctional Defendants knew that men in the Tier II Program were isolated around the clock, unable to exit their cells to seek officer help, and particularly likely to need such help, given the high incidence of serious medical emergencies, suicides, and other deaths in the Tier II Program at GSP.  Given these conditions, each of the Prison Administration and Individual Correctional Defendants knew that someone in the Tier II Program would need help during the period when they failed to conduct their inspections and rounds, yet they knowingly disregarded the risk of harm posed by their chronic absence."  *Id*. ¶ 113.

- "The Prison Administration and Individual Correctional Defendants evinced deliberate indifference to Mr. Mouton's serious medical need by, for two to three days, knowingly failing to react to the sight of Mr. Mouton lying unresponsive in his cell in urine-soaked clothing; knowingly failing to react to Mr. Mouton being unable to take his daily medications; knowingly failing to react to Mr. Mouton's

food trays going untouched; repeatedly ignoring other men's pleas that they check on Mr. Mouton; and failing to provide Mr. Mouton with ameliorative medical care for a period of two to three days." *Id*. ¶ 190.

Mouton also alleges the days each of the GSP defendants worked and how their duties included checking on Mouton.  *Id*. ¶ 100.

Taken as true, these allegations, along with many others not necessary to recite, tend to establish that each GSP defendant had subjective knowledge of a risk of serious harm to Mouton and that they disregarded that risk by ignoring his unresponsiveness and other prisoners' pleas for help.  That conduct, as alleged, would constitute "more than gross negligence."  *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1234 (11th Cir. 2010); *see Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (holding that a jury could have concluded that officers were more than grossly negligent to a pretrial detainee's serious medical needs where the officers knew he was unconscious for fourteen minutes and failed "to check [his] condition, call for medical assistance, administer CPR or do anything else to help"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015)[7]; *Patel v. Lanier Cnty., Ga.*, 969 F.3d 1173, 1190 (11th Cir. 2020) (emphasis in original) (quoting *Harper*, 592 F.3d at 1234) (holding that a deputy's "*total* inaction" "was worse 'than gross negligence.'").

---

[7] Citing the facts of *Bozeman*, the defendants argue that Mouton has failed to sufficiently plead conduct that amounts to "more than gross negligence."  Doc. 88 at 5.  The defendants focus on the level of subjective knowledge the defendants in *Bozeman* had and argue that Mouton's "amended complaint does not show that the Prison Administration and Individual Correctional Defendants 'knew' Plaintiff had an urgent medical condition."  *Id.*  This is a misstatement of Mouton's allegations.  As explained above, he has sufficiently alleged that each Prison Administration and Individual Correctional defendant *knew* of his serious medical condition—not that they may have, could have, or should have known.  And Johnson argues Mouton has failed to plead facts indicating he was "more than grossly negligent" because "[i]t is not alleged that it was his duty to perform medical welfare check on individual inmates."  Doc. 90 at 5.  This also is a clear misstatement of Mouton's allegations—he states that Johnson "was required by prison policy to inspect the dormitory once per day," and during his inspections, he "did, in fact, observe and understand that Mr. Mouton was experiencing a medical emergency" and "turned a blind eye."  Doc. 67 ¶¶ 100f, 101, 107.

The GSP defendants do not seriously question the sufficiency of Mouton's allegations.  Rather, they argue that "[a]ggregating" them "leads to implausible results." Docs. 73-1 at 20; 74 at 6-7.  As the *only* example, they cite Mouton's allegations that each defendant was responsible for the administration of his medicine.  Doc. 73-1 at 20. Even if that single allegation were not plausible, Mouton otherwise plausibly alleges that during a four-day period, each of these defendants discovered and ignored Mouton's condition.  Again, according to Mouton, *each* was required to check on him *at least* twice a week, sometimes daily.  Doc. 67 ¶ 100.  True, each individual defendant "'must be judged separately and on the basis of what that person knows,'" but this "does not mean that [Mouton] may not accuse multiple Defendants of the same misconduct, where each Defendant had subjective knowledge of the risk of harm to [him] and each Defendant evinced deliberate indifference to that risk."[8]  *Burnette*, 533 F.3d at 1331; Doc. 82 at 6-7 (citing *Kyle*, 208 F.3d at 944).

Finally, the GSP defendants contend that some of Mouton's allegations contradict others.  Doc. 86 at 10-11.  For example, they argue that it is not possible that they "refuse[d] to 'check on'" Mouton and, at the same time, "ask[ed] if he wanted a shower" and saw "him lying passed out on the floor."  *Id.* at 11.  Even if those allegations are contradictory, such minor inconsistencies are not enough for the Court to find that Mouton has failed to state a claim.

---

[8] The Court notes that when the parties convened a Rule 26(f) conference on April 5, 2023, Mouton's counsel told defense counsel that they were willing to consent to a complete stay of discovery pending the Court's decision on the defendants' motions to dismiss "if the Defendants agreed to provide limited discovery aimed at reducing the number of defendants."  Doc. 78 at 4.  Mouton's counsel further requested records indicating which officers were working and present in Mouton's dorm from January 4, 2021 to January 7, 2021.  *Id.*  But defense counsel "declined" the limited discovery proposal and "declined to provide any initial discovery."  *Id.* at 5.  Perhaps those defendants who may believe that they had no involvement should have consented to discovery.

*2. Violation of "Clearly Established" Law*

The defendants do not address the issue of whether their alleged conduct was counter to clearly established law.  Mouton, on the other hand, cites Eleventh Circuit case law holding that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity."  Doc. 82 at 7 n.5 (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)).  The defendants apparently agree.

Accordingly, the GSP defendants, at this stage, are not entitled to qualified immunity and Mouton can proceed with his deliberate indifference to serious medical needs claim.

## B. The GSP Defendants' Alleged Deliberate Indifference to Mouton's Conditions of Confinement

In their attack on Mouton's conditions of confinement claim, the defendants take a divide-and-conquer approach.  Although Mouton pleads a single claim for his prolonged term in Tier II, the defendants argue he really pleads two separate claims— one for the period of November 1, 2018 to October 28, 2020 and another for the period of December 29, 2020 to January 7, 2021.[9]  Docs. 73-1 at 15, 15 n.6; 74 at 14 n.9; 86 at 1-2.  Claim one is barred, the defendants say, because, and only because, he failed to exhaust—they do not argue that claim one fails to state a claim or that it is barred by qualified immunity.  Docs. 73-1 at 8-14; 74 at 13.  For claim two, they argue that Mouton fails to state a claim for such a brief period of solitary confinement and that they are all entitled to qualified immunity.  Docs. 73-1 at 14-17; 74 at 8-9, 14-16; 87 at 3-5.  They do

---

[9] The defendants assert that this "second stint" in Tier II ended on January 4 or 5, 2021.  Docs. 73-1 at 15 n.6; 86 at 1.  But Mouton alleges he did not leave Tier II until January 7, 2021.  Doc. 67 at 19 n.4.

not argue that he failed to exhaust his claim for any period of confinement ending

January 7, 2021.[10]

Thus, the initial question is whether the Court can divide up the single conditions

of confinement claim Mouton pleads in his complaint.  The answer, on this record, is no.

In his complaint, Mouton alleges he remained in Tier II "for about two years."  Doc. 67 at

19 n.4.  Specifically, in his conditions of confinement count, he repeatedly states that it

is based on "*prolonged* solitary confinement."  *Id*. ¶¶ 204-06 (emphasis added).  He then

alleges "he was briefly moved to a general population dormitory" in "winter 2020" and

returned to Tier II "on or around December 29, 2020."  *Id*. at 19 n.4.  And in his

response brief, he makes clear that his conditions of confinement "claim is not based on

the one week he spent in the Tier II Program immediately preceding his stroke.  It is

based on the *months and years* he spent in prolonged solitary confinement."  Doc. 82 at

23 (emphasis supplied).  Thus, it is unclear—from the face of his complaint—when,

why, or for how long he was moved to general population.  All he alleges is that he was

both moved from, and returned to, Tier II in "winter 2020."  Doc. 67 at 19 n.4.  This is not

sufficient to "separate" Mouton's conditions of confinement allegations into two distinct

claims.

The defendants point to exhibits they submitted in support of their exhaustion

defense to bolster their argument that Mouton had two separate stints in Tier II.  *See*

Doc. 73-1 at 10-13.  These exhibits, which show Mouton's "movement history," indicate

that on October 28, 2020, Mouton was moved from the K Building (Tier II) to the C

---

[10] The defendants also originally argued that Mouton's conditions of confinement claim is time-barred.
Docs. 73-1 at 13-14; 74 at 13-14.  However, the defendants now acknowledge that Mouton's alleged
incapacity precludes consideration of that defense on a motion to dismiss.  Docs. 86 at 6; 87 at 4 n.2.

building (general population) for "administrative" reasons.  Docs. 73-2 ¶ 11; 73-4 at 1.

The Court is wary of relying on this "movement history" to establish that Mouton had two

separate terms in Tier II.  First, his movement history during the relevant time allegedly

shows that on at least one other occasion, he was moved from Tier II to general

population for about two months.  Doc. 73-4 at 1 (movement to C building on August 3,

2020).  But the defendants do not suggest this move establishes another "separate"

term in Tier II.  Second, Mouton's grievance history indicates that he was still in Tier II in

November 2020, which is consistent with his allegation that he was moved from Tier II

for a short period in "the winter of 2020."  Docs. 67 at 19 n.4; 73-12 ("This is an

emergency grievance about conditions in my cell.  I live on Tier II at Georgia State

Prison.").  Finally, the Court cannot conclude as a matter of law that Mouton's conditions

of confinement claim must be divided up simply because he was briefly moved in and

out of Tier II for some unexplained reason.  As far as the Court knows, prison officials

may have moved Mouton from solitary confinement to make it appear that his term in

Tier II was not prolonged or did not exceed prescribed limits for Tier II confinement.

Because the defendants raise no argument for the dismissal of Mouton's single

conditions of confinement claim, the Court could stop here.  But for the sake of

completeness, the Court continues.

### 1. Qualified Immunity

The defendants do not argue that Mouton's *single* conditions of confinement

claim for the period ending January 7, 2021 is barred by qualified immunity.  Rather,

they focus their qualified immunity argument solely on the second, as they perceive it,

conditions of confinement claim and argue that a *short* stay in Tier II cannot support a

claim.  Docs. 73-1 at 14-17; 74 at 14-16.  That argument is simply not relevant to the claim Mouton alleges.  Thus, the Court addresses the issue of whether Mouton's single conditions of confinement claim is barred by qualified immunity.

        a. Constitutional Violation

        Mouton's allegations regarding the conditions in Tier II during his alleged stay from November 1, 2018 until January 7, 2021 are sufficient to state a claim under the Eighth Amendment.

        The conditions under which a prisoner is confined are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  Only actions that deny prisoners "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations under the Eighth Amendment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Prison officials must "provide humane conditions of confinement [and] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measure to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  "'No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'"  *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting *Rhodes*, 452 U.S. at 346).  Because "'restrictive and even harsh'" prison conditions "'are part of the penalty that criminal offenders pay for their offenses against society,'" "prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.'"  *Id*. (quoting *Rhodes*, 452 U.S. at 347).

To state an Eighth Amendment conditions of confinement claim, a plaintiff must allege "two components: one objective and the other subjective." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020). Under the objective component, a plaintiff must allege that the conditions were "'extreme'" and "'pose[d] an unreasonable risk of serious damage to his future health or safety.'" *Chandler*, 379 F.3d at 1289 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) and *Helling*, 509 U.S. at 33). This requires an allegation that "an objectively substantial risk of serious harm … exists." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001), *abrogated on other grounds by Twombly*, 550 U.S. at 561-63. Under the subjective component, a plaintiff must allege that a defendant acted with deliberate indifference, meaning that he or she knew "'of and disregard[ed] an excessive risk to inmate health or safety.'" *Swain*, 958 F.3d at 1089 (quoting *Farmer*, 511 U.S. at 837). This requires an allegation that each defendant "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than *gross* negligence." *Wade*, 67 F.4th at 1374 (emphasis in original).[11] Mouton's complaint sufficient alleges both the objective and subjective components.

First, Mouton has sufficiently alleged that the conditions in Tier II and the ACU posed "an objectively substantial risk of serious harm." *Marsh*, 268 F.3d at 1029. Among *many* other things, for two years while in Tier II and the ACU, Mouton "lived in filthy cells that were infested with rats and other vermin"; "[h]e was rarely allowed out of his cell for any reason except to shower"; "the stench of his and other men's urine and

---

[11] Although *Wade* was decided in the context of a medical needs claim, a plaintiff must also allege that a defendant was deliberately indifferent to succeed on a conditions of confinement claim under the Eighth Amendment, and it is thus an appropriate standard here. 67 F.4th at 1366; *see Chandler*, 379 F.3d at 1289.

feces overtook the dorm"; he "was held in a cell that was smeared with the feces, urine, and blood of previous occupants"; he slept naked in his cell "on the filthy concrete"; and "[h]e often had to use his own thin paper gown to wipe himself."  Doc. 67 ¶¶ 74, 77-78, 80, 84-87.  He was confined to these conditions 23 to 24 hours a day.  *Id*. ¶¶ 74-75.  And he alleges this "[p]rolonged solitary confinement in unhygienic conditions create[d] a substantial risk of "serious physical and psychological harm."  *Id*. ¶¶ 205, 208.  These conditions, as alleged, were objectively "extreme" and posed a substantial risk of serious harm to Mouton.  *See Taylor v.* Riojas, 592 U.S. __, 141 S. Ct. 52, 54 (2020); *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018).

Second, he has sufficiently alleged that the GSP defendants had subjective knowledge of this risk of serious harm and disregarded that risk with more than gross negligence.  With respect to the Prison Administration defendants, he alleges they shared "final authority over" his placement in Tier II and the ACU, "including the duration and degree of isolation imposed."  Doc. 67 ¶ 159.  With respect to both the Prison Administration and Individual Correctional defendants, he alleges, *inter alia*, that they "made rounds in GSP's Tier II Program and were thus knowledgeable about the practice of keeping people, including Mr. Mouton, in prolonged solitary confinement, without access to recreation or outdoor time, in filthy and vermin-infested cells" and were also aware of "the practice of transferring such people, including Mr. Mouton, to filthy cells in the ACU without access to clothing, bedding, or hygiene items."  *Id*. ¶ 162.  Finally, Mouton alleges that the conditions were so "deplorable" that the substantial risk of harm posed by them was "obvious to all Defendants."  *Id*. ¶ 161.  And Mouton alleges that "[d]espite all the Defendants' knowledge of the harmful conditions … Defendants

individually and collectively failed to cure them."  *Id.* ¶ 165.  As discussed above,

complete inaction where there is an objectively serious risk of harm can be enough to

establish "more than gross negligence."  *See Bozeman*, 422 F.3d at 1273; *Harper*, 592

F.3d at 1234; *Patel*, 969 F.3d at 1190; *Marsh*, 268 F.3d at 1029 (holding that the plaintiff

stated a conditions of confinement claim where the "alleged lack of action [was] not

reasonable under the alleged circumstances").

Accordingly, Mouton has sufficiently alleged a conditions of confinement claim

based on his term in Tier II ending January 7, 2021.

### b. Violation of "Clearly Established" Law

The defendants argue that "the law was not 'clearly established' that Plaintiff's

*one week* in Tier II violated the Eighth Amendment."  Docs. 73-1 at 16-17; 74 at 14-16

(emphasis added).  But because the Court cannot conclude as a matter of law that

Mouton's term in Tier II can be divided into two separate claims, that argument is not

relevant.  The only question raised by the conditions of confinement claim that Mouton

pled is whether the defendants violated clearly established law when they housed

Mouton or allowed him to be housed in solitary confinement for two years under the

conditions alleged.  Doc. 82 at 25-26.

In *Taylor v. Riojas*, cited by Mouton, the United States Supreme Court held that

certain egregious conditions of confinement—even for a period of six days—are so

obviously unconstitutional as to put any reasonable prison officer on notice.  592 U.S. at

__, 141 S. Ct. at 53 (holding that a defendant may violate clearly established law when

he allows an inmate, for six days, to be housed in a cell covered in feces where he did

not eat or drink for four days, he was moved to another cell that was "frigidly cold" and

also covered in sewage, and "he was left to sleep naked in sewage" because "any reasonable officer should have realized that [the inmate]'s conditions of confinement offended the Constitution").  Here, Mouton has alleged that he was subject to live in a cell much like, and arguably more uninhabitable than, the cell in *Taylor*—but for *over two years*.[12]

Because Mouton has sufficiently alleged that the GSP defendants violated clearly established law when they failed to remedy the conditions of his confinement, they are not entitled to qualified immunity.

*2. Exhaustion*[13]

The defendants' exhaustion argument, like their qualified immunity argument, fails to address the conditions of confinement claim Mouton has pled.  They only argue that his grievances filed November 14, 2019 and November 23, 2020 failed to exhaust any claim for a period of confinement in Tier II ending October 28, 2020.  Docs. 73-1 at 10-12; 73-11; 73-12; 73-13; 74 at 13.  They raise no exhaustion defense to Mouton's claim arising from his Tier II confinement ending January 7, 2021.  *See* Doc. 86 at 7 ("[B]ecause the first alleged violation is barred by Plaintiff's failure to exhaust, Plaintiff is

---

[12] The defendants argue, with no apparent conviction, that "[e]ven if the Court takes into consideration Plaintiff's first stint in Tier II from November 1, 2018 to Fall 2020, the caselaw still does not 'dictate' or 'truly compel' the conclusion that his Eighth Amendment rights were violated" because "the Supreme Court, Eleventh Circuit, and Georgia Supreme Court have yet to definitively determine how much time in solitary confinement is too much."  Doc. 73-1 at 16-17.  Because Mouton's conditions of confinement claim is based on the totality of the circumstances in Tier II, and not based solely on the fact that he was placed in solitary confinement, this argument is not relevant.

[13] The PLRA requires inmates to exhaust administrative remedies only if they are currently confined.  42 U.S.C. § 1997e(a).  Mouton filed his complaint on January 4, 2023 and was released from prison on January 26, 2023.  Doc. 1; GDC, *Find an Offender*, https://services.gdc.ga.gov/GDC/OffenderQuery/jsp/OffQryForm.jsp?Institution= (search, "Mouton, Khalid").  If he would have filed his complaint after that date, he arguably would not be subject to the PLRA's exhaustion requirements.  *See Q.F. v. Daniel*, 768 F. App'x 935, 938 (11th Cir. 2019) ("Based on the PLRA's plain language, this exhaustion requirement only applies when the plaintiff is confined in a correctional facility when the lawsuit is commenced.") (citing *Harris v. Garner*, 216 F.3d 970, 974 (2000)).

left with only the second alleged violation that occurred from December 29, 2020, to January [7], 2021.").  This presumably is for the same reason the defendants did not argue Mouton failed to exhaust his deliberate indifference to serious medical needs claim or his "second" conditions of confinement claim—Mouton was unable to file a grievance because he was allegedly incapacitated.[14]  *See Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 625 (6th Cir. 2011) (holding that the exhaustion procedure could be considered "unavailable" to a prisoner who was mentally impaired); *Whitington v. Sokol*, 491 F. Supp. 2d 1012, 1015 (D. Colo. June 19, 2007) (suggesting that mental incapacity may toll the time to exhaust administrative remedies).  Accordingly, Mouton's conditions of confinement claim is not subject to dismissal for failure to exhaust.[15]

## C. Supervisory Liability

Finally, the Agency defendants argue Mouton's supervisory liability claims fail as a matter of law because he cannot show a necessary causal connection between their conduct and the alleged constitutional violations.  Doc. 73-1 at 17-19.  In response, Mouton argues the "[d]efendants' argument strains credulity and should be rejected."  Doc. 82 at 27.  Without putting it quite that emphatically, the Court agrees.

It is well established that "'supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or

---

[14] Because the defendants do not raise an exhaustion defense to Mouton's conditions of confinement claim arising from his Tier II confinement ending January 7, 2021, the Court declines to address whether the grievance process was unavailable for other reasons, as Mouton suggests.  Docs. 67 ¶¶ 90-95; 82 at 8-18.

[15] Even if his conditions of confinement claim was based on his confinement from November 1, 2018 to winter 2020, Mouton did not receive rejections of two of his grievances regarding his conditions of confinement in Tier II and the ACU until January 4, 2021.  Docs. 73-12 at 1; 73-13 at 1.  Thus, he became incapacitated before the appeal period for both of those grievances ran on January 11, 2021.  Doc. 73-3 at 14.

vicarious liability.'"  *Keith v. DeKalb Cnty., Ga*., 749 F.3d 1034, 1047 (11th Cir. 2014)

(quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  "Instead, to hold a

supervisor liable a plaintiff must show that the supervisor either directly participated in

the unconstitutional conduct or that a causal connection exists between the supervisor's

actions and the alleged constitutional violation."  *Id*. at 1047-48.  "The necessary causal

connection can be established when a history of widespread abuse puts the responsible

supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.

Alternatively, the causal connection may be established when a supervisor's custom or

policy results in deliberate indifference to constitutional rights or when facts support an

inference that the supervisor directed the subordinates to act unlawfully or knew that the

subordinates would act unlawfully and failed to stop them from doing so."  *Id*. at 1048

(cleaned up).

As Mouton argues, dismissal is not appropriate because his complaint

adequately alleges a causal connection between "a history of widespread abuse" of

which the Agency defendants were aware and the delay in his medical care and the

conditions of his confinement.  *See* Doc. 82 at 26-29.  Mouton's complaint contains

numerous citations to sources and events that allegedly put these defendants on notice

"of unconstitutional conditions and of numerous instances of serious harm in GSP's Tier

II Program dorms."  *Id*. at 27.  These sources include internal and external audits,

incident reports, staffing reports, and a letter from Mouton's counsel.

For example, in his complaint, Mouton cites four audits from 2018-2019 which

provided "urgent warnings" regarding the conditions in the Tier II units that could

potentially lead to suicide and "cognitive decompensation."  Doc. 67 ¶¶ 169-174.  One

of those audits "noted that counselors in the Tier Program regularly 'copied and pasted' notes about mental status check-ups and that security officers failed to conduct 30-minute rounds in administrative segregation dorms." *Id*. ¶ 174.  Another audit warned of "possible legal jeopardy" based on the "deficiencies" in the Tier II Program.  *Id*. ¶ 173. And Mouton alleges that "[e]ach of the Agency Defendants was subjectively aware of the internal and external audit reports because the reports were provided to them, and they read the reports consistent with their job duties."  *Id*. ¶ 167.  Indeed, one audit specifically copied defendant Sauls and "instructed GSP officials to submit a written remediation plan … to the Department's Central Office, of which Defendants Holt, Toole, Shepard, Sauls, and Lewis are all members."[16]  *Id*. ¶ 176.

Also cited in his complaint is a May 21, 2020 letter from Mouton's counsel to defendants Bobbitt, Toole, Holt, and Shepard "warning" them "that conditions in the Tier II Program housing units had fallen below constitutional standards."  *Id*. ¶ 179.  That letter "specifically referenced Plaintiff Mouton's experiences in the Tier II housing units and the ACU."  *Id*.  It contained a long list of "problematic conditions," including: "[u]nsanitary, rat-infested cells"; "[f]ilthy showers"; "[i]nadequate out-of-cell-time"; "[i]nadequate mental health care, leading to an increase in suicides"; "[c]hronic understaffing and lack of supervision, leading to widespread violence, serious delays in responding to medical emergencies, and preventable deaths"; "[d]eplorable conditions in the ACU, including cells smeared in human waste and lack of access to hygiene supplies"; and "[a]n inability by persons incarcerated in the Tier II Program to access the grievance process."  *Id*.  The letter also states that the unsanitary showers were "littered

---

[16] Regardless of the year of each audit, Mouton alleges that "[t]he conditions described in the 2018 and 2019 audits were unchanged from the conditions in January 2021."  *Id*. ¶ 177.

in dead roaches and fruit flies" and notes conditions in the ACU, including a bed that "was smattered with blood," a cell that "was covered in feces and blood," and the lack of cleaning supplies.  Doc. 82-1 at 4-5.  It further dedicates entire sections to the unsanitary conditions in Tier II and the delays in responses to medical emergencies.  *Id.* at 3-8, 10.

Moreover, Mouton alleges that between April 2020 and April 2021, "five people died by suicide or homicide in" Tier II, and "[a]t least two other people housed in these units died under circumstances that the prison classified as 'undetermined.'"  Doc. 67 ¶ 53.  And on other occasions, a prisoner in Tier II coughed up blood and no officer "arrived for nearly three hours," a prisoner in Tier II "was left in his cell for nearly 24 hours after falling and injuring himself," and two other prisoners in Tier II "were left seizing in their cells" with delayed or no officer assistance.  *Id.* ¶¶ 55-56, 137.  And he specifically alleges that the Agency defendants "received multiple incident reports documenting" the "alarming number of medical emergencies, suicides, homicides, and other preventable deaths in the GSP Tier II Program units between April 2020 and April 2021."  *Id.* ¶¶ 132-133.

Mouton further alleges in his complaint that the Agency defendants were "aware of GSP's 60% officer vacancy rate" and the "obvious" risks posed by "chronic understaffing and inadequate officer supervision."  *Id.* ¶¶ 130, 194.  His complaint repeatedly notes these risks, including irregular showers for inmates in Tier II, delayed responses to medical emergencies, an increase in suicides, and the inability to conduct required safety checks. *Id.* ¶¶ 65, 131-134, 139, 179.

Mouton alleges that, based on these audits, incident reports, staffing reports, and the letter, the Agency defendants "had abundant notice of the irreparable harms that people in the Tier II Program did suffer" and "[y]et they knowingly failed to respond to the harms." *Id*. ¶ 193.  Regarding his conditions of confinement claim, he alleges the Agency defendants were aware of the conditions at the Tier II and ACU units because of these sources, but that they "declined to take corrective measures to protect the people in their custody from a substantial risk of serious harm." *Id*. ¶ 142.

Taken as true, Mouton's complaint sufficiently alleges a causal connection between the Agency defendants' conduct and the alleged Eighth Amendment violations. These defendants each held a position of authority at the GDC that required him or her to ensure the safety of each inmate within the GDC—including those at GSP. *Id*. ¶¶ 17-21.  Each of these defendants allegedly read the audits detailing the deficiencies in GSP's Tier II Program.  Each of these defendants allegedly knew that GSP had a 60% officer vacancy rate and were aware of the risks associated with that fact.  Each of these defendants received incident reports detailing several unanswered medical emergencies in GSP's Tier II units.  And Agency defendants Toole, Holt, and Shepard were specifically warned by Mouton's counsel about the conditions of the cells in GSP's Tier II Program, including Mouton's, and the risk of delays in responses to medical emergencies, particularly because of the understaffing issue.  These reports would put any reasonable high-ranking official on notice of widespread problems related to medical emergencies and conditions of confinement at GSP.  And according to Mouton, they did nothing in response.

Therefore, Mouton's supervisory liability claims against Agency defendants Holt, Toole, Shepard, Sauls, and Lewis do not fail as a matter of law and are not subject to dismissal.

## IV. CONCLUSION

The defendants have failed to show that, as a matter of law, Mouton's Eighth Amendment claims should be dismissed.  Accordingly, their motions to dismiss (Docs. 73; 74) are **DENIED**.  The discovery stay in this action (Doc. 79) is **LIFTED** and the parties are **ORDERED** to file their proposed scheduling/discovery order by October 13, 2023.

**SO ORDERED**, this 3rd day of October, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT